**Jerome E. PALMA, Petitioner,**

v.

**UNITED STATES of America, et al., Respondent.**

**No. Misc.A. 98–209.**

United States District Court, E.D. Pennsylvania.

April 21, 1999.

Stanford Shmukler, Philadelphia, PA, for petitioner.

Richard Mentzinger, Jr., United States Attorney's Office, Philadelphia, Pa, for respondent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, Senior District Judge.

Jerome Palma has petitioned the court for the restoration of his firearms privi-

leges. After considering his petition, and after holding a hearing, the court makes the following findings of fact and conclusions of law.

*FINDINGS OF FACT*

1. On December 10, 1987, petitioner Jerome E. Palma pled guilty to a two count information under 26 U.S.C. § 7206(1) for making false statements on a federal income tax return.

2. These charges arose from Palma's conduct while working as a marketing director at Atlantic City casinos. During his tenure in those positions, he received payoffs from various entities that did business with the casinos in return for favorable treatment. He received more than $100,000 in payoffs, some of which he shared with his supervisor. Palma failed to disclose any of that money as income on his tax returns.

3. At his sentencing on February 18, 1988, the court suspended petitioner's sentence, placed him on five years probation and ordered him to pay a fine of $10,000.00. Mr. Palma successfully completed all terms and conditions of his sentence, and he was discharged from probation early.

4. Since this offense, Petitioner has had no adverse contacts with any law enforcement agents.

5. For the past eleven years petitioner has worked as a real estate appraiser. Until approximately two years ago, petitioner was employed by Palma/Lazar Associates. In 1997 petitioner opened his own real estate appraisal business, ProData Services.

6. He seeks relief from the disability because his present occupation requires him to inspect and photograph the inside and outside of houses he appraises, many of which are in high crime neighborhoods. In the course of his appraisal work he is required to carry a camera and other equipment. Frequently that equipment must be left in the car while he is inside the appraised property.

7. He has learned that other appraisers have been robbed and their cars burglarized. He testified as to one incident in which an appraiser's camera was stolen out of his car, and while the appraiser was successfully chasing down the camera thief, someone else stole the car radio. Mr. Palma was unable to testify as to the specifics of any other incident.

8. Other appraisers hired by him have refused to make appraisals in certain neighborhoods. Therefore, Petitioner makes those appraisals himself. Appraisal work in these certain neighborhoods poses such a danger than he needs to carry a handgun for protection while working in those areas. Mr. Palma testified that he would only use a gun in self-defense in a situation where his life was threatened, and not in a situation merely where property was being stolen.

9. Before his conviction, Mr. Palma had owned a gun for fifteen years. He had never received formal training on its use. In connection with one of his license renewals, he was graded acceptable by the State Police.

10. The court accepted several letters of recommendation attached to the petition, all of which are from people who deal with Mr. Palma in his business and who say that his professional and personal character and reputation are excellent. The court also heard testimony from witnesses to the same effect at the hearing.

11. Mark Yaskin is an attorney who has known Mr. Palma personally for twenty-five years and who has represented him and several of Mr. Palma's friends and family members in that time. Mr. Yaskin says that Mr. Palma is "a likeable, hard working person, who is interested in performing his business, as well as personal activities, in a honest and forthright manner. He has an excellent reputation in the community for honesty and integrity and fair dealing, and he conducts himself in a very professional manner." Ex. A. Mr. Yaskin also testified similarly at the hear-

ing and said that he believes allowing Mr. Palma to carry a weapon would cause no danger to the public.

12. John F. Bolger Jr. has known Mr. Palma for the last twelve years and has handled his personal and business insurance needs. He says that his observations of Mr. Palma are that he is "a man of excellent character," and he says that Mr. Palma's employees, clients, and neighbors also hold him in high esteem. *See* Ex. B.

13. Michael Bratman is a sales executive for a mortgage company who has known Mr. Palma for four years. As the appraisal manager for the mortgage company, Mr. Bratman dealt directly with Mr. Palma by subcontracting appraisal work to Mr. Palma's company. Mr. Bratman reports that Mr. Palma's dealings with customers and his handling of the required paperwork are handled well under high pressure situations. *See* Ex. C.

14. Patricia Franchetti is the manager of a mortgage company who has known Mr. Palma professionally, as his company provides appraisals to her company. She also knows the Palma family socially. She says that he has a fine reputation in the business community, and she personally knows him to be a devoted family man. *See* Ex. D.

15. Joseph Napoletano is a realtor and appraiser who has known Mr. Palma for over ten years He says that petitioner has demonstrated his loyalty and professionalism on numerous occasions and that "[w]ithout hesitation I would trust any of my family members in his care." Ex. E. Mr. Napoletano testified similarly at the hearing and said that he believes allowing Mr. Palma to carry a weapon would cause no danger to the public.

16. Sheila Sellers is the manager of a division of a mortgage corporation who has known petitioner for approximately eight years. Mr. Palma provided expert appraisal services to her company, and she found him to be "dedicated to his profession, proficient in his job duties, and con-sistently willing to go beyond what was expected." Ms. Sellers has maintained a personal friendship with Mr. Palma and attests to his personal integrity as well as his genuine interest in his community. She further attests that "his genuine concern for others is reflected in the positive attitudes of clients and co-workers alike." Ex. F.

17. Rita Gillin is the vice-president of a mortgage company for which Mr. Palma has provided appraisal services for the last ten years. She says that he is "trustworthy with strong moral ethics and has a very positive work history within the Mortgage Industry." Ex. G.

18. Kenneth Connolly is the manager of Mr. Palma's business. He testified that his impression of Mr. Palma and his knowledge of Mr. Palma's reputation formed in the ten years he has known and worked with him lead him to the belief that allowing Mr. Palma to possess a gun would not result in a danger to the public. He further testified that in his capacity as manager, it is his job to find appraisers to do particular jobs, and some do refuse to do appraisals in certain areas due to safety concerns.

19. Cindy Palma, petitioner's daughter, is an appraiser who gets assignments from her father's company. She carries a gun while working. She has never fired it, but there have been two occasions on which she displayed the gun to prevent anything harmful from happening to her. One incident was when a tenant in a house she was appraising used physical force to get her out of his apartment, and the other was when she was menaced by a group of men on the street in front of a vacant house she was going in to appraise. On both occasions, she believes that letting it be known that she had a gun protected her from harm. Ms. Palma further testified that she believes allowing Mr. Palma to carry a weapon would cause no danger to the public.

20. The court accepts the representations of members of his community that he is a person of good character, of sound mind, with no history of mental illness, and is not likely to act in a manner dangerous to the public safety.

*CONCLUSIONS OF LAW*

21. The Gun Control Act of 1968 makes it unlawful for any person convicted of a crime punishable by imprisonment for a term exceeding one year "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate commerce." 18 U.S.C. § 922(g). Thus, as a convicted felon, Mr. Palma was barred as a matter of federal law from possessing any firearm.

22. Congress provided that a person who is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition may apply to the Secretary of the Treasury for relief from the disabilities imposed by federal law with respect to the acquisition, receipt, transfer, shipment, transportation, or possession of firearms. *See* 18 U.S.C. § 925(c).

23. Section 925(c) further provides that "the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.*

24. The authority to grant relief has been delegated by the Secretary of the Treasury to the Director of the Bureau of Alcohol, Tobacco and Firearms (ATF). *See* 27 C.F.R. § 178.144.

25. Under the provisions of § 925(c), a person whose application for relief is denied by the ATF may file a petition with the United States District Court for the district in which he or she resides to request judicial review of the denial. *See* 18 U.S.C. § 925(c). The statute provides that in reviewing the agency's denial of the application, the court may in its discretion admit additional evidence "where failure to do so would result in a miscarriage of justice." *Id.*

26. The Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub.L. No. 102–393, 106 Stat. 1729 (1992) (Public Law 102–393), became effective on October 6, 1992. Title I of the law appropriated sums for the Department of the Treasury and various Treasury agencies, including the ATF, for the fiscal year ending September 30, 1993. The ATF appropriations language contained the specific proviso: *"none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. § 925(c)."* 1992 U.S.C.C.A.N. (106 Stat.) 1732 (emphasis added). Congress has imposed similar spending prohibitions in appropriations legislation for fiscal years 1994–1999. *See* Treasury, Postal Service, and General Government Appropriations Acts, 1994–1998, Pub.L. No. 103–123, 1993 U.S.C.C.A.N. (107 Stat.) 1226, 1228–1229 (1993); Pub.L. No. 103–329, 1994 U.S.C.C.A.N. (108 Stat.) 2382, 2385 (1994); Pub.L. No. 104–52, 1995 U.S.C.C.A.N. (109 Stat.), 468, 471 (1995); Pub.L. No. 104–208, 1996 U.S.C.C.A.N. (110 Stat.) 3009–314, 3009–319 (1996); Pub.L. No. 105–61, 1997 U.S.C.C.A.N. (111 Stat.) 1272, 1277 (1997); and Pub.L. No. 105–277 (October 22, 1998). The ATF is thus precluded from spending appropriated funds to investigate or act upon applications from individuals for relief from firearms disabilities. *See generally Rice v. Department of Alcohol, Tobacco and Firearms*, 68 F.3d 702, 707 (3d Cir.1995); *Burtch v. U.S. Dep't of the Treasury*, 120 F.3d 1087, 1089 (9th Cir.1997).

27. Congress has repeatedly stated that the reason for this prohibition is that an ATF determination to grant relief "could have devastating consequences for innocent citizens if the wrong decision is

made," and that the ATF's scarce resources "would be better utilized" on more pressing matters, such as fighting crime. S.Rep. No. 103–106 at 20 (1993); S.Rep. No. 102–353, at 19–20 (1992). *See also Owen v. Magaw*, 122 F.3d 1350, 1352 (10th Cir.1997); *United States v. McGill*, 74 F.3d 64, 67 (5th Cir.). In conjunction with its fiscal year 1996 reenactment of this ban, Congress explained that "those who commit felonies should not be allowed to have their right to own a firearm restored . . . there is no reason to spend the government's time or taxpayer's money to restore a convicted felon's right to own a firearm." H.R.Rep. No. 104–183 at 15 (1995). However, Congress has not changed the law providing legal authority to grant relief in appropriate cases, and § 925(c) remains on the books.

28. In *Rice v. United States*, 68 F.3d 702 (3d Cir.1995), the Third Circuit held that, notwithstanding Congress' refusal to appropriate funds to the ATF to investigate applications for restoration of federal firearms privileges, the District Court had jurisdiction to consider a petitioner's application for relief from federal firearms disability.[1] After concluding that the appropriations acts "fail to show a clear intent to repeal section 925(c) or to preclude judicial review of BATF's refusal to grant relief from firearms disabilities," *id.* at 707, the court analyzed the situation under the rubric of exhaustion of administrative remedies. The court recognized that this type of case "poses a special problem," because "[t]he initial determination that [the petitioner] qualifies for relief from his firearm disability involves the exercise of BATF's discretion and relies on BATF's expertise—two factors that favor strict applica-

tion of the·exhaustion requirement." *Id.* at 709. Because the statute "gave the district courts discretion to create or supplement the administrative record when necessary to avoid a miscarriage of justice," though, the court ruled that when the ATF is precluded from considering applications, the court can consider them. *Id.*

29. The Third Circuit instructed that a district court should proceed as follows:

[T]he district court should determine in the exercise of its sound discretion whether the failure to admit [the petitioner]'s evidence would result in a miscarriage of justice. Following that initial decision, the district court should then decide, on the basis of all the evidence before it, whether [the petitioner] has met his burden of showing he "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."

*Id.* at 709–10, *quoting* 18 U.S.C. § 925(c). The court cautioned that because "the Supreme Court has held that the right to possess a firearm after a disabling conviction is a privilege, not a right," the petitioner "bears a heavy burden in his attempt to support his statutory claim." *Rice*, 68 F.3d at 710.

30. The court described the ATF's procedure as follows:

To determine whether an applicant is entitled to relief, BATF conducts a broad-based field investigation concentrating on the statutory criteria surrounding the applicant's disabling conviction and the applicant's record and reputation. It also interviews the appli-

---

1. As the government points out, the Third Circuit is the only Court of Appeals so to hold. Since *Rice*, three other circuits have held that the defunding acts suspend all relief under the statute and that courts lack subject matter jurisdiction to consider petitions where there has been no denial by ATF. The courts reason that Congress surely does not think that the expenditure of judicial time on such petitions is any less disadvantageous than the expendi-

ture of ATF time, especially in light of courts' relative inexpertise and inability to conduct an investigation. *See Owen v. Magaw*, 122 F.3d 1350, 1353 (10th Cir.1997); *Burtch v. United States Dep't of the Treasury*, 120 F.3d 1087, 1090 (9th Cir.1997); *United States v. McGill*, 74 F.3d 64, 67–68 (5th Cir.); *see also* Gregory Pals, Note, *Judicial Review Under 18 U.S.C. § 925(c): Abrogation Through Appropriations?*, 76 Wash.U.L.Q. 1095 (1998).

cant, the listed character references, employers, members of the community where the applicant lives, the applicant's probation officer and other law enforcement officers, as well as other law enforcement records.

*Id.* at 705 (internal quotation marks and cites omitted). The court considers this advisory as to the types of information it is to evaluate in ruling on Mr. Palma's request.

31. The court finds that the government's failure to provide funds to investigate and process applications for relief as provided in the statute constitutes a miscarriage of justice, where, as here, Petitioner meets the statutory requirements for such relief and there is no way for him to obtain the relief authorized by the statute.

32. Considering all of the circumstances and the evidence presented, the court finds that Mr. Palma will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.

An appropriate Order follows.

### *ORDER*

**AND NOW,** this 21st day of April, 1999, for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law, it is hereby **ORDERED** that the Petition of Jerome E. Palma for Relief from Disability and for the Restoration of Federal Firearms Privileges Pursuant to the Gun Control Act of 1968 is **GRANTED.**